UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
DOZIE F. CHUKWUKA,                                    **MEMORANDUM & ORDER**
                                                      08 CV 2095 (RJD) (LB)
                        Plaintiff,

            -against-

CITY OF NEW YORK, BROOKLYN
BOROUGH PRESIDENT OFFICE,

                        Defendants.
--------------------------------------------------------------X

DEARIE, Chief Judge.

        Pro se plaintiff Dozie Chukwuka, a black male and a former Assistant Civil Engineer in

the Office of the Brooklyn Borough President ("BBPO"), claims that BBPO, in violation of Title

VII of the Civil Rights Act of 1964, denied his request for promotion to Chief Engineer of BBPO

because he is black. Chukwuka also claims that BBPO retaliated against him on several

occasions, including giving him a negative performance review for filing a charge of

discrimination with the Equal Employment Opportunity Commission ("EEOC"), and terminating

him for filing this lawsuit. Lastly, Chukwuka asserts state law claims of intentional infliction of

emotional distress and mental anguish.

        Discovery is complete and BBPO and the City of New York move for summary

judgment seeking dismissal of Chukwuka's complaint in its entirety. For the reasons that follow,

the motion is granted.

## BACKGROUND

        Chukwuka was employed by BBPO from 1990 to 2008. He began working as an

Engineer Intern in 1990, and was promoted shortly thereafter to Assistant Civil Engineer in the

Topographical Bureau. (Defs.' Ex. B, Chukwuka Dep. Tr. at 12-16.) [1] As Assistant Civil Engineer, Chukwuka's responsibilities included processing house address applications, preparing and reviewing neighborhood maps, and monitoring borough construction projects.

BBPO began yearly performance evaluations of Chukwuka in July 2003. For the July 2002 to June 2003 period, Chukwuka received an overall rating of "Good." Alvin Goodman, BBPO's Chief Engineer, noted that Chukwuka was skilled at his work and Goodman encouraged Chukwuka "to develop a more cordial and cooperative demeanor when dealing with clients, and to continue his efforts to improve his relationships with colleagues in the Topo Bureau." (Defs.' Ex. C.) Chukwuka acknowledged receipt of the evaluation, noting: "I personally do not agree with the overall rating of the evaluation, but I signed it since there is room for improvement." (Id.)

For the July 2003 to June 2004 period, Chukwuka again received an overall rating of "Good." (Defs.' Ex. D.) During the year, Goodman had placed Chukwuka under the direct supervision of Assistant Chief Engineer Reginald Caphart. Caphart, like Chukwuka, a black male, was appointed Assistant Chief Engineer in March 2004, and Goodman had placed Chukwuka under his supervision hoping that Chukwuka would "make good progress toward the objective of assuming full responsibility for legal status and mapping products" in Caphart's absence. (Defs.' Ex. H.) Goodman noted, however, that up to that point Caphart had to closely supervise Chukwuka and he opined that the "goals of Topo . . . will not be fully achieved" until Chukwuka earns his and Caphart's confidence. (Defs.' Ex. D.) Goodman encouraged

---

[1] The facts are derived from the defendants' Rule 56 Statement of Undisputed Facts and exhibits attached thereto. The Court has reviewed Chukwuka's objections to defendants' statement of facts. None of his objections -- most of which go to the fact that Alvin Goodman failed to sign certain documents -- raises a genuine issue of material fact.

Chukwuka to upgrade his professional credentials to that of a Licensed Professional Engineer, "as a needed step toward a higher career goal." (Id.)

Chukwuka's work performance took a turn for the worse once he was placed under Caphart's supervision. For the July 2004 to June 2005 period, Chukwuka received an overall rating of "Conditional." Goodman noted that while there had been a net gain in Chukwuka's productivity as a result of his collaboration with Caphart, their "supervisor-assistant relationship has required detailed written instructions concerning techniques and standards, step-by-step supervision, and formalities that exceed the levels normally employed by engineering teams." Goodman further noted that there had been "periodic breakdowns of the relationship" and that management intervention had been required on several occasions. Goodman concluded that "[o]verall, [Chukwuka's] adherence to normal office protocol [was] unsatisfactory." (Defs.' Ex. E.) In a July 22, 2005 memorandum to file, Goodman further explained the bases for Chukwuka's "conditional" rating: Chukwuka had a "general problem with disrespectful demeanor, over-defensiveness when criticized, and other types of unprofessional behavior and poor judgment," and "[r]egrettably, [Chukwuka's] collaboration with the Assistant Chief Engineer has not been smooth, and he has not gained the Chief Engineer's confidence that he is capable anytime in the foreseeable future of providing a full and responsible backup for the Assistant Chief Engineer." (Defs.' Ex. H.) Chukwuka "totally disagree[d] with the overall rating." (Defs.' Ex. E.)

Chukwuka's performance continued to worsen. In November 2005, BBPO charged Chukwuka with "misconduct" and "insubordination" for, among other things: (i) disrespectful and discourteous behavior towards Caphart; (ii) not completing an assignment; (iii) refusing to accept an assignment; and (iv) verbally threatening Caphart during a meeting. (Defs.' Exs. K,

M.) Chukwuka denied the charges. In a memorandum to BBPO's Human Resources Director, he suggested that Caphart was jealous of him because he was "the only approved candidate for the Professional Engineering Licensing Examination by the New York State Board of Education in this office" and that it was Caphart's jealousy that led Caphart to wrongfully accuse him of poor performance. (Defs.' Ex. L.) After a conference held by BBPO, Chukwuka was penalized five days loss of annual leave on December 23, 2005. (Defs.' Ex. N.)

On July 27, 2006, Chukwuka received an overall rating of "conditional" for the July 2005 to June 2006 period. (Defs.' Ex. F.) Goodman reiterated the by-now obvious and escalating conflict between Chukwuka and Caphart and reported that "[o]verall, [plaintiff] has not gained the level of technical skills expected by now, and his adherence to normal office protocol has been unsatisfactory." Chukwuka responded in a memo to Goodman dated August 25, 2006, in which he again suggested that the discord between the two men stemmed from Caphart's jealousy of Chukwuka's allegedly superior professional experiences and certifications:

> Mr. Caphart does not have the engineering experience to be a supervisor/Assistant Chief Engineer. Hence, my work performance evaluation by Mr. Reginald Caphart indicates enviousness, insecurity and deceit;

> The fact that I am the only one in this department with engineering civil service title (Assistant Civil Engineer), and a candidate for the professional engineering licensing has made me a victim of enviousness and hatred. Hence, Mr. Caphart has been intentionally criticizing my completed assignments.

(Defs.' Ex. I.)

On August 29, 2006, Chukwuka received his New York State professional engineering license, and he requested that BBPO promote him from Assistant Civil Engineer to Civil Engineer. (Defs.' Ex. V.) On October 3, 2006, BBPO informed him that there were no vacancies within the agency to which he could be promoted. (Defs.' Ex. W.) Chukwuka

testified that he had no reason not to believe the BBPO's position. (Defs.' Ex. B., Chukwuka Dep. Tr. at 29.)

On December 28, 2006, BBPO again charged Chukwuka with insubordination and included a charge of incompetence for failing to accurately and efficiently perform his assignments. (Defs.' Ex. O.) Chukwuka responded to the charges, requesting that he no longer be required to work under Caphart, and reiterating that Caphart's jealousy was the root of the problem:

> the "problem is on the office set-up; where [Caphart, a] civil service title-Associate City Planner has been assigned to supervise civil service title-Assistant Civil Engineer, now a Professional Engineer. Thereby creating unbalance environment that emanates enviousness and bitterness."

(Defs.' Ex. P.)

Chukwuka requested another supervisor, noting that he needed a "supervisor who [unlike Caphart] does not insult his subordinates by name calling such as idiot, stupid, foolish, and ape," "who will stand by his instructions," "is sincere in critising [sic] completed assignments," and "who has engineering experience" and "knowledge of engineering principles and practice." (Id.) After an initial hearing in February 2007, BBPO's grievance hearing officer recommended a penalty of 10 days suspension without pay. Chukwuka appealed that decision. The initial determination was affirmed after a hearing on October 24, 2007, and Chukwuka was suspended without pay for 10 days. (Defs.' Ex. R.)

For the July 2006 to June 2007 period, Chukwuka received an overall evaluation of "below conditional." Goodman again noted that Chukwuka was having problems with Caphart, that his work performance was poor, and that his technical competence fell below Goodman's expectations. Chukwuka signed the evaluation noting that it was a "bias [sic] evaluation to discredit and downgrade the only NYS licensed professional engineer of the agency."

5

Goodman retired as Chief Engineer of BBPO in 2007. On December 10, 2007, Chukwuka applied for the position. He was denied the promotion. On or before April 1, 2008, BBPO rehired Goodman to serve as Chief Engineer on an interim basis.

Chukwuka filed a charge of discrimination with the EEOC in January 2008, alleging that BBPO's decision not to promote him to Assistant Civil Engineer in September 2006 and his "conditional" rating for the July 2006 to June 2007 performance period were on account of his "race and/or national origin." In a Notice of Dismissal and Right to Sue Letter dated March 18, 2008, the EEOC notified Chukwuka that it had dismissed his charge because he had failed to provide specific instances of discriminatory conduct. (Defs.' Ex. AA.)

On March 27, 2008, BBPO again filed disciplinary charges against Chukwuka, charging him with insubordination and misconduct for failing to comply with Caphart's directions. Plaintiff filed his initial complaint commencing this action on May 22, 2008. On July 30, 2008, Chukwuka was notified that he was being transferred to the Department of Design and Construction ("DDC"), effective August 4, 2008. He filed an amended complaint on February 23, 2009.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). On a motion for summary judgment, a court "must first resolve all ambiguities and draw all inferences in favor of the non-moving party." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000)

(quoting Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991)). In opposing a motion for summary judgment, however, the nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . or upon the mere allegations or denials of the adverse party's pleading." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (quotation marks and citation omitted). Rather, the nonmoving party must "come forward with evidence that would be sufficient to support a jury verdict in his favor." Id. Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Winnie v. City of Buffalo Police Department, 2003 WL 251951, at *3 n.11 (W.D.N.Y. Jan. 13, 2003) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

The Court is cognizant that because evidence of discrimination in the workplace is "rarely overt," id. at *3 (citing Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999)), "trial courts must be particularly cautious about granting summary judgment in the employment discrimination context," Clemente v. New York State Div.of Parole, 684 F. Supp. 2d 366, 371 (S.D.N.Y. 2010). "Nonetheless, 'summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.'" Id. (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Id. (quoting Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)).

The Court is also cognizant that because plaintiff is proceeding pro se, it must read his opposition papers "liberally, construing them to raise their strongest arguments." Bligen v. Griffen, 2007 WL 430427, at *2 (S.D.N.Y. Feb. 8, 2007) (citing Burgos v. Hopkins, 14 F.3d

787, 790 (2d Cir. 1994)).  Nonetheless, "a pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat a motion for summary judgment." Jackson v. County of Nassau, 2010 WL 335581, at *5 (E.D.N.Y. Jan. 22, 2010) (citations omitted).

II.     Title VII Claims

Title VII of the Civil Rights Act of 1964 "forbids employment discrimination on the basis of 'race, color, religion, sex, or national origin.'" Clemente, 684 F. Supp. 2d at 372 (quoting Richardson v. Comm'n on Human Rights and Opportunities, 532 F.3d 114, 119 (2d Cir. 2008) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Title VII also "forbids an employer to retaliate against an employee for, inter alia, complaining of employment discrimination prohibited by Title VII." Ventimiglia v. Hustedt Chevrolet, 2009 WL 803477, at *13 (E.D.N.Y. Mar. 25, 2009) (quoting Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006), citing 42 U.S.C. § 2000e-3(a)).

"Though they have distinct elements," claims of discrimination and retaliation under Title VII "share certain prerequisites." Clemente, 684 F. Supp. 2d at 373.  "Most importantly, each requires a showing that the employer's allegedly wrongful conduct derived from a specifically prohibited factor – 'namely, race, color, religion, sex, or national origin.'" Id. (quoting 42 U.S.C. § 2000e-2(a)(1)).  In addition, each claim is analyzed using the familiar burden-shifting McDonnell Douglas test.  Id. at 374 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Under that test, the plaintiff bears the burden of establishing a prima facie case of discrimination or retaliation.  If he establishes a prima facie case, "[t]he burden then shifts to the employer who must provide a legitimate, nondiscriminatory business rationale to justify its conduct." Id. (citing Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).  "If the employer provides such a rationale, the presumption created by the prima facie

case 'drops out,'" id. (quoting Roge v. NYP Holdings, Inc., 257 F.3d 164 (2d Cir. 2001)), and

the "plaintiff must then present admissible evidence of 'circumstances that would be sufficient

to permit a rational trier of fact to infer that the [employer's] decision was more likely than not

based in whole or in part on discrimination.'" Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 139

(2d Cir. 2003)).

Before reaching the merits of Chukwuka's claims, the Court notes that despite

Chukwuka's performance and conduct taking a turn for the worse as a result of his strained

relationship with Caphart, Chukwuka admits that race played no role in the discord between the

two men:

> Q:    With Mr. Caphart, what did he do that made you believe that he was
>       discriminating against you or . . . any type of hostile work environment
>       based on your race?
>
> A:    I didn't say it's based on the [sic] race.

(Defs.' Ex. B, Chukwuka Dep. Tr. at 58.)[2]  Indeed, although the record indicates that Chukwuka

complained *ad nauseam* about how Caphart treated him, there is no evidence in the record that

he ever complained that Caphart treated him poorly because of his race.  Rather, it is clear that

Chukwuka believes that the discord between him and Caphart stemmed entirely from Caphart's

jealously over his professional accreditations.  Against this backdrop, the Court turns to the

merits of Chukwuka's claims.

---

[2] Chukwuka's amended complaint can be read to raise a hostile work environment claim under
Title VII.  In his opposition papers, however, Chukwuka asserts that "there are four causes of
action alleged" -- failure to promote, retaliation, and his two state law claims, and he does not
argue hostile work environment. (Pl's.' Response to Defendants' Local Rule 56.1 Statememt ¶
1.)  Even if the Court were to reach the merits of a hostile work environment claim, the claim
would necessarily fail given Chukwuka's admission that race did not play a role in the way
Caphart treated him.  See Clemente, 684 F. Supp. 2d at 374.

*A. Failure-to-Promote*

Chukwuka's claim that BBPO failed to promote him to Chief Engineer because he is black is meritless. To establish a prima facie case of discrimination for failure to promote, Chukwuka must demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for the Chief Engineer job; (3) he suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination. See Bush v. Fordham University, 452 F. Supp. 2d 394, 407 (S.D.N.Y. 2006) (citing Williams v. R.H. Donnelley Corp., 368 F.3d 123, 126 (2d Cir. 2004)). Chukwuka has met his prima facie burden of satisfying the first and third elements, namely that he is a member of a protected class and that he suffered an adverse employment action. He has not, however, met his prima facie burden of demonstrating that he was qualified for the position of Chief Engineer or that the circumstances surrounding BBPO's decision not to promote him support an inference that the decision was on account of his race.

Chukwuka has not met his burden of coming forth with any evidence revealing the minimum credentials that BBPO expected of its new Chief Engineer or that "he met [BBPO's] criteria for the position.'" Id. (quoting Williams, 368 F.3d at 127). Rather, Chukwuka conclusorily argues that he was qualified for the Chief Engineer position because he possessed a professional engineering license. (Pl.'s Aff. in Opp. ¶ 1(c) ("The plaintiff was qualified for the position of Chief Engineer, Director of Topographic, which was the only promotional position available for a licensed professional engineer employer of the defendant.")) While the Court does not doubt that BBPO requires its Chief Engineer to possess an engineering license, the Court seriously doubts that it is BBPO's only requirement. Thus, even for the purpose of clearing the low hurdle of establishing a prima facie case, Chukwuka's self-serving,

unsubstantiated assertion that he was qualified for the Chief Engineer position because he possessed an engineering license is insufficient. See e.g., Wolde-Meskel v. Argus Community, Inc., 2001 WL 883648, at *7 (S.D.N.Y. Aug. 7, 2001) (plaintiff's conclusory assertion that he was qualified for the open position he sought was insufficient to establish a prima facie case of discrimination) (citing Meckenberg v. New York City Off-Track Betting, 42 F. Supp. 2d 359, 378 (S.D.N.Y. 1999)).[3]

Nor has Chukwuka met his prima facie burden of demonstrating that the circumstances surrounding BBPO's decision not to promote him gives rise to an inference of discrimination. Chukwuka has set forth no direct evidence that race played any role in the decision. Rather, he asserts that in order to "deprive [a] black man a promotion that is well deserved" BBPO re-hired Alvin Goodman, a white male. (Defs. Ex. B, Chukwuka Dep. Tr. at 84.) The hiring of an individual outside a minority's protected group may give rise to a prima facie inference of discrimination, but only if the plaintiff demonstrates that he and the individual hired were "similarly situated." See Wolde-Meskel, 2001 WL 883648, at *7 n.5 (citing Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)). While they need not be identically situated, the plaintiff must "show []he was 'similarly situated in all material respects' to the individuals with whom []he seeks to compare [him]self." Graham, 230 F.3d at 39. Chukwuka and Goodman were not similarly situated employees: before retiring, Goodman was the Chief Engineer at BBPO for several years while Chukwuka, as Assistant Civil Engineer, reported to Goodman.

---

[3] Chukwuka's insistence that he was promised by a former BBPO official that he would be appointed Chief Engineer once he obtained his professional engineering license does not alter the Court's conclusion. Chukwuka has presented no evidence of this promise being made and the promised (purportedly made several years before he applied for the Chief Engineer position opened up) does not establish that Chukwuka was qualified for the position.

Even if Chukwuka had met his prima facie burden, BBPO has articulated legitimate, nondiscriminatory reasons for not promoting Chukwuka. The record is replete with negative performance reviews and evidence of inappropriate conduct by Chukwuka almost all of it originating with Caphart, a man Chuwkuka concedes was not racially motivated to discriminate against him. In the face of this overwhelming evidence, Chukwuka has not come forth with any credible evidence that suggests that these reasons were mere pretexts for not promoting him. Accordingly, his Title VII claim for failure to promote is dismissed.

*B. Retaliation*

For plaintiff to prove a claim for retaliation he must establish that: "(1) []he engaged in a protected activity, (2) defendants knew about the activity, (3) defendants took an adverse employment action against [him], and (4) a causal connection exists between the protected activity and the adverse action." Vinson v. New York City Dept. of Corrections, 2006 WL 140553, at *6 (E.D.N.Y. Jan. 17, 2006) (citing Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000)).

Chukwuka claims five instances of retaliation. First, he contends that because he announced at a March 15, 2005 office meeting that BBPO's former legal counsel had promised him the Chief Engineer position if he obtained his engineering license, BBPO gave him an overall rating of "conditional" for the July 2004 to June 2005 time period. Second, he contends that because he requested a promotion to Civil Engineer in September 2006, BBOP gave him an overall rating of conditional for the July 2006 to June 2007 time period. Third, he contends that because he received a "right to sue" letter from the EEOC on March 21, 2008, BBPO disciplined him on March 27, 2008. Fourth, he contends that because he filed this lawsuit on May 22, 2008, BBPO notified him on July 8, 2008 that his position was being eliminated effective August 8,

2008. Lastly, he contends that because he filed his EEOC charge on September 26, 2007, BBPO suspended him without pay for two weeks on October 26, 2007. None of his claims has merit.

Chukwuka's first three claims fail because he has not established that he engaged in a protected activity. "Protected activities under Title VII fall into two categories: opposition and participation." Barlow v. Connecticut, 319 F. Supp. 2d 250, 261 (D. Conn. 2004). "An employee engages in a protected activity when []he has (1) 'opposed any practice made an unlawful employment practice' by Title VII, or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." Id. (citing 42 U.S.C.§ 2000e-3(a)). Neither Chukwuka's announcement at an office meeting that he was promised the Chief Engineer position nor his request for a promotion is a protected activity. See e.g., Bain v. Wal-Mart Stores, Inc., 585 F. Supp. 2d 449, 453 (W.D.N.Y. Nov. 12, 2008) ("[I]n order for an employee's complaints to be a 'protected activity' they must relate to an alleged violation of Title VII, i.e., the complaints must relate to race or gender. Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in Title VII even when race or gender was not an issue.") (internal citations omitted). Nor is his receipt of a right to sue letter from the EEOC a protected activity. See Derosena v. General Bd. of Pensions & Health Benefits of United Methodist Church, Inc., 560 F. Supp. 2d 652, 670 (N.D. Ill. 2008) (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The suggestion that the EEOC's issuance of a right-to-sue-letter – an action in which the employee takes no part – is a protected activity of the employee" is "utterly implausible")). Accordingly, Chukwuka's first three claims of retaliation are dismissed.

Chukwuka's claim that he was retaliated against for filing the instant lawsuit fails because he cannot demonstrate that he suffered an adverse action. It is well established that "[a]

plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "An 'adverse employment action' is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotations and citation omitted)). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. (quoting Terry, 336 F.3d at 138) (internal quotations, alterations, and citation omitted).

Despite Chukwuka's characterization that he was terminated by BBPO in retaliation for filing his lawsuit, the record indicates that he was laterally transferred to DDC. Indeed, Chukwuka admits as much: "On August 4, 2008, plaintiff's employment with the defendant was terminated on a disadvantageous employment action of same title transfer." (Pl's Aff. in Opp. ¶ 8(e).) Chukwuka holds the same civil service title at DDC -- Assistant Civil Engineer -- that he held at BBPO and his salary and benefits have remained the same. (Defs.' Ex. B, Chukwuka Dep. Tr. at 33-34). While he insists that his responsibilities have changed, he adamantly refused at his deposition to answer in what way they have changed. (Id. at 34-35.) Because Chukwuka has not shown that his lateral transfer "result[ed] in a change in responsibilities so significant as to constitute a setback to [his] career," Vinson, 2006 WL 140533, at *7 (quoting Galabya, 202 F.3d at 641), his claim is dismissed.

Finally, Chukwuka's claim that BBPO disciplined him in October 2007 in retaliation for filing his EEOC charge in September 2007 fails because he cannot establish the requisite causal

connection between the two acts. "Proof of . . . a causal connection can be established directly through evidence of retaliatory animus directed against a plaintiff, or indirectly by showing that the protected activity was followed closely by discriminatory treatment [or] through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." Barney v. Consolidated Edison Co. of New York, --- F.Supp.2d ----, 2009 WL 6551494, at *11 (E.D.N.Y. 2009) (quoting Terry, 336 F.3d at 152). Chukwuka's attempt to establish causal connection by demonstrating only that the BBPO's disciplinary action in October 2007 occurred sufficiently close in time to his filing of the EEOC charge in September 2007 is not persuasive.

As an initial matter, Chukwuka mistakenly states that he filed his EEOC charge in September 2007; the record demonstrates that he filed it in January 2008, three months after he was disciplined. (Defs. Ex. Z.)[4] Because Chukwuka filed the EEOC charge after he was disciplined, it is simply not possible to infer that BBPO's disciplined him in October 2007 in retaliation for filing the charge. Even if Chukwuka filed his EEOC charge in September 2007, he would still not be able to establish the requisite causal connection between the two events. BBPO filed the disciplinary charges against Chukwuka in February 2007 but because of the grievance appellate process that he initiated BBPO did not impose a penalty until that process finally ran its course. Because the decision to file charges was made before Chukwuka's protected activity and he has failed to set forth any evidence that the penalty imposed was the product of any racial animus, Chukwuka has not met his prima facie burden of establishing the

---

[4] Chukwuka's confusion over the date that he filed his EEOC charge may be attributable to the fact that he claims that he went to a local EEOC office to complain about BBPO on September 26, 2007. The Court does not opine on whether visiting an EEOC office to complain about an employer may constitute a protected activity; it is sufficient to conclude that no retaliatory motive can attach to an employer's subsequent actions where, as here, the plaintiff sets forth no evidence that the employer was aware of his going to the EEOC office. (Defs.' Ex. B, Chukwuka Dep. Tr. at 77.)

requisite causal connection between his protected activity and BBPO's purported adverse action. See Bazile v. City of New York, 215 F. Supp. 2d 354, 388 (S.D.N.Y. 2002) (dismissing retaliation claim where defendant's decision to file disciplinary charges occurred before purported protective activity and plaintiff presented no evidence that ultimate decision was the product of racial animus).

In any event, even if Chukwuka had met his prima facie burden, BBPO has articulated legitimate, nondiscriminatory reasons for taking the above actions and Chukwuka has not come forward with any credible evidence that would convince a reasonable juror that the actions were a pretext for racial discrimination. Accordingly, his claims are dismissed.

III. State Law Claims

A. Intentional Infliction of Emotional Distress

Chukwuka's state law claims also fail. Under New York law, to establish a claim for intentional infliction of emotional distress, a plaintiff must set forth proof indicating: "1) extreme and outrageous conduct; 2) intent to cause, or reckless disregard of substantial probability of causing severe emotional distress; 3) a causal connection between the conduct and the injury; and 4) severe emotional distress." See Daniels v. Health Insurance Plan of Greater New York, 2005 WL 1138492, at *2 (S.D.N.Y. 2005) (internal citations omitted). Claims of intentional infliction of emotional distress are only viable when the plaintiff establishes that he was subjected to conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (1986), quoting Restatement (Second) of Torts § 46.1, comment d)).

As an initial matter, New York courts routinely hold that IIED claims against government agencies, including New York City, are barred for public policy reasons. See Llerando-Phipps v. City of New York, 390 F. Supp. 2d 372, 381 (S.D.N.Y. 2005) (citing Lauer v. City of New York, 240 A.D.2d 543, 659 N.Y.S.2d 57 (2d Dept. 1997). Even if the Court were to reach the merits of Chukwuka's IIED claim, dismissal would still be warranted. "New York courts regularly deny intentional infliction of emotional distress claims in employment discrimination cases" and seem to permit them only where claims are "accompanied by allegations of sex discrimination, and more significantly, battery." Daniels, 2005 WL 1138492, at *3 (quoting Gerzog v. London Fog Corp., 907 F. Supp. 590, 604 (E.D.N.Y. 1995) (citing cases)). Chukwuka's claims that he was "questioned on every completed assignment," interrupted by his colleagues while trying to speak, prevented from going to lunch at his "allowed lunch time" because his supervisors intentionally called meetings during that time, yelled at and called idiot and ape at these meetings, and terrorized by a co-worker's hitting of cabinets next to Chukwuka's desk, come nowhere close to raising an inference that he was subject to extreme and outrageous conduct or that he suffered severe emotional distress. See Sharabura v. Taylor, 2003 WL 22170601, at *4 (E.D.N.Y. 2003) (plaintiff's claim that her "employer criticized her unfairly, gave her undesirable assignments and ultimately terminated her" did not meet New York's high threshold for conduct actionable under IIED) (citing Spence v. Maryland Cas. Co., 995 F.2d 1147, 1158 (2d Cir. 1993)).

## B.  Intentional Infliction of Mental Anguish

Chukwuka's claim of intentional infliction of mental anguish is duplicative of his claim for intentional infliction of emotional distress. See e.g., Dawkins v. Williams, 413 F. Supp. 2d 161, 179 (N.D.N.Y. 2006). Accordingly, it is dismissed for the reasons stated above.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to each of plaintiff's claims. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      September 17, 2010

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge